1
2
3
4
5
6
7
8
9
10   UNITED STATES DISTRICT COURT
11   SOUTHERN DISTRICT OF CALIFORNIA
12

| | |
|---|---|
| EMBOTELLADORA ELECTROPURA S.A. de C.V., an El Salvador corporation, <br><br> Plaintiff, <br><br> v. <br><br> ACCUTEK PACKAGING EQUIPMENT COMPANY, INC., a California corporation; and DOES 1 through 25, inclusive, <br><br> Defendant. | Case No.:  3:16-cv-00724-GPC-MSB <br><br> **ORDER:** <br> **1) DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW** <br><br> **2) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR NEW TRIAL** <br><br> **3) STRIKING THE DECLARATIONS OF TODD PETERS AND OMOTUNDE OGUNGBE** <br><br> [ECF Nos. 111 & 130] |

Presently before the Court are two motions filed by Defendant Accutek Packaging Equipment Company, Inc. ("Accutek"): Motion for Judgment as Matter of Law under Federal Rule of Civil Procedure ("Rule") 50(b), filed on November 5, 2018, and Motion for New Trial, filed on December 9, 2018. ECF No. 111 and 130. Both motions have been fully briefed. On April 25, 2019, the Court took both motions under submission. ECF No. 140. Upon consideration of the moving papers and the applicable law, and for the reasons set forth below, the Court **DENIES** Defendant's Motion for Judgment as Matter of Law and **GRANTS in part** Defendant's Motion for New Trial.

## BACKGROUND

### A. Procedural Background

This case concerns the sale of an allegedly defective Biner Ellison water bottling machine (the "Monoblock") by Defendant Accutek to Plaintiff Electropura. Defendant Accutek is a developer and manufacturer of complete packaging solutions, and offers a wide variety of filling machines, capping machines, labeling machines, and complete packaging systems. Dkt. No. 30-1 at 2. Electropura is a bottled water company with water bottling facilities in El Salvador. *Id.*

Due to the Monoblock's alleged deficiencies and defects, Electropura brought seven claims against Accutek: (1) fraudulent misrepresentation and conspiracy to defraud; (2) fraudulent concealment and conspiracy to defraud; (3) negligent misrepresentation; (4) breach of written contract; (5) breach of express warranty; (6) breach of implied warranty; and (7) restitution and unjust enrichment.

At the close of discovery, Accutek moved for partial summary judgment to enforce the limitation on liability provision contained within the purchase agreement executed with Electropura. Upon consideration of the moving papers, the Court decided that the limitation on liability provision was enforceable and limited damages to no more than the purchase price of the equipment unless Plaintiff was found liable for fraud or misrepresentation.

The Court conducted a seven-day trial from October 28 to November 7, 2018. At

the close of Electropura's case-in-chief on November 5, Accutek moved orally for judgment as a matter of law pursuant to Rule 50(a) on the basis that Electropura's fraud claims fail as a matter of law and that the lack of fraud required dismissal of Electropura's unjust enrichment cause of action. ECF No. 111. The Court requested that the motion be briefed in writing and deferred ruling on the motion until after the completion of jury deliberations and the issuance of the jury's special verdicts. That same day, Accutek filed a written Motion for Judgment as a Matter of Law as to the fraud causes of action (first, second and third) and the unjust enrichment cause of action (seventh). ECF No. 111.

On November 9, 2018, the jury returned a verdict in favor of Electropura on the first cause of action for intentional misrepresentation and in favor of Accutek on all other claims. As a result of the jury's special verdict on Electropura's claim for intentional misrepresentation, the jury awarded Electropura nothing for "lost past earnings," $72,000 for "lost past profits," and $210,825.00 for "other past loss" for a total of $282,285 in compensatory damages. ECF No. 118, pg. 3. After the jury verdict in favor of Electropura, a punitive damages phase of trial was held and, following deliberations, the jury awarded Electropura an additional $525,000 in punitive damages. There was no motion for judgement as a matter of law made as to the punitive damages claim.

On December 9, 2018, Accutek moved for a new trial on the grounds that (1) Electropura's claim of intentional misrepresentation failed as a matter of law; and (2) that Electropura failed to present sufficient evidence to justify the jury's punitive damages award. ECF No. 130. Electropura filed an opposition to the motion on December 26, 2018. ECF No. 134. Accutek's reply followed on January 4, 2019. ECF No. 135. In adherence with this Court's briefing schedule, ECF No. 125, Electropura also filed an opposition to the motion for judgment as a matter of law on December 3, 2018. ECF No. 126. Accutek filed a reply on December 5, 2018. ECF No. 129.

**B. Factual Background** [1]

Orlando Perla, the head of production for Electropura, testified at trial regarding, among other things, the history of Electropura, its use and satisfaction with a Biner Ellison bottling machine purchased in 2005 and the decision to buy a new bottling machine to grow the Electropura business. Trial Tr. at 4-7 (Oct. 29, 2018). In the fall of 2012, Orlando Perla researched machines by country of origin and capabilities and decided on purchasing an American-made machine with the capacity of bottling 8-9,000 bottles per hour. He contacted Nick Bird with Accutek, the producer of Biner Ellison machines, to inquire about the purchase, installation, and maintenance of Accutek's high-speed water bottling equipment. *Id.* at 8-9. Following this contact, Nick Bird responded by email and provided catalog information on Accutek's bottling equipment line. *Id.* The catalog displayed bottling machines which featured filling valves made with 316 stainless steel and a rotary rinsing turret made with stainless steel. *Id.* at 17-18. Orlando Perla testified that he notified Accutek that these were important features for Electropura. *Id.*

On October 9, 2012, Joe Quezada, Defendant's sales representative, emailed Orlando Perla and provided a link to Accutek's website. *Id.* at 18. On the website, Mr. Perla reviewed information regarding Accutek's Monoblock bottling systems which claimed "Biner Ellison manufactures Monoblock machines to simplify your high-speed bottling line by combining the bottle rinser filler and capper in a single space saving machine. Each Monoblock machine is specifically designed to suit product demands, space constraints, and the production environment in order to optimize output and produce the best product possible." *Id.* at 21. From this, Mr. Perla understood that Defendant manufactured its Monoblock systems. *Id.*

---

[1] Accutek asserts that there is an insufficient evidentiary basis for the jury finding on the intentional misrepresentation claim. However, Accutek failed to provide a trial transcript and merely repeats the refrain that there was insufficient evidence to support the fraud claims. Given this failure, the Court has obtained those portions of the trial transcripts that support the jury's verdict and referenced them as appropriate.

The website also described the Monoblock as featuring a sanitary stainless steel constructed frame which was very important and necessary to Orlando Perla. *Id.* at 23. In addition, the equipment guidelines from Accutek's web site stated that Accutek machinery is designed and manufactured in the USA with over 80 percent of the Accutek parts and products being manufactured in the USA by American-owned companies. *Id.* at 25. Mr. Perla testified that this information was also very important that he would not have purchased the subject machine if he had known that it was made in China and not the United States. *Id.*

During those negotiations, Electropura told Defendants that it required equipment capable of "filling 680 milliliter-sized bottles at the rate of not less than 7,200 bottles per hour ("BPH"), 380 milliliter-sized bottles at the rate of not less than 6,200 BPH and 1,300 milliliter-sized bottles at the rate of not less than 5,000 BPH," and asked Defendants "for their advice and recommendations as to which of Defendants' several different models of high speed water bottling equipment" would meet those specifications. Electropura's Complaint ¶ 20. In response to Plaintiff's inquiry, Defendant than recommended the "Monoblock rinse, fill, and capping system" as best suited to satisfy Plaintiff's purpose. *Id.* ¶ 21 (internal citations omitted). At about that same time, Defendant also presented a promotional sales brochure to Electropura that described the "MB Series mono block – rinse/fill cap systems" as having the following qualities and capabilities: "Up to 19,000+ container per hour* high speed synchronized rinse, fall, cap system," and "fully automated CCP system." *Id.* Ultimately, Defendant specifically recommended that Electropura purchase the "Biner Ellison Monoblock Systems 24 head washer 24 head filler 8 head capper with accessories and parts system" (the "Monoblock") as the best match for Electropura's needs. *Id.* ¶ 22 (internal citations omitted).

On December 10, 2012 Defendants provided Electropura with Quote No. 52113 for a 24 head, 24 filler, and 8 capper Monoblock, along with related parts and accessories. Trial Tr. at 30 (Oct. 29, 2018). The Monoblock Quote was written on

Accutek's letterhead, and included the name of the sales representative, Joe L. Quezada, who prepared the report, and described the Monoblock features in detail. ECF No. 1-2, Exhibit 2 at 13. Notably, the Monoblock Quote stated that the machine was "capable of Speeds of up to 11000 BPH (bottles per hour)," Trial Tr. at 30 (Oct. 29, 2018), ECF No. 1-2 at 15, and that many of its parts were made of stainless steel. Trial Tr. at 31-32 (Oct. 29, 2019). Orlando Perla testified that Accutek represented that all bottle contact parts on the machine were made with food grade stainless steel or food grade plastic. Orlando Perla shared the information he had developed with his brothers and a decision was made to purchase the Biner Ellison machine. *Id.* at 31-33.

Between December 2012 and August 2013, the parties worked out the details of the transaction including where the machine would be installed, how much space was available and whether the system would fit at the Electropura plant. *Id.* at 35-37. At the request of Joe Quezada, Orlando Perla provided Accutek an autoCAD with the layout of the available space at the Electropura plant for the Monoblock so that it could be reviewed by Accutek's engineering department. *Id.* at 35-37, 39-40. Afterwards, Quezada did not inform Mr. Perla that the available space was too small to achieve the represented production speeds for the machine. *Id.* at 36-37. Mr. Perla told Quezada "that's what I have. If it doesn't work, it doesn't work." *Id.* at 36, 40-41. Quezada reported to Mr. Perla that according to his engineer "yeah, it will work." *Id.* Based upon Quezada's representation, Mr. Perla agreed to proceed with the purchase of the Monoblock. *Id.* at 36-37.

In reliance upon those representations, Electropura purchased the Monoblock for $370,408.46. To finance the purchase of the Monoblock, Electropura obtained a loan with a principal of $1,450,000, at interest, and allocated $375,000 to the purchase of the Monoblock machine. ECF No. 127 at 33-34. Thereafter, Electropura incurred additional costs in the shipment and delivery of the Monoblock to El Salvador, amounting to $49,982.14, and installation of the system, $15,893.97. ECF No. 1 ¶ 27.

Soon after the Monoblock was delivered and installed at Electropura's facility in

El Salvador, Electropura discovered, on or about December 2013, that the Monoblock was not functioning "in accordance with the representations, specifications, promises, and assurances made by Accutek." *Id.* ¶ 28. The Monoblock's actual production hovered at 1,200 BPH for 1,300 milliliter-sized bottles, 1,800 BPH for 680 milliliter-sized bottles, and 2,400 BPH for 380 milliliter-sized bottles, *id.*, far below Electropura's previously-stated business needs. According to Orlando Perla, the Monoblock was never able to achieve a capacity in excess of 4,000 BPH for bottles of any size. Trial Tr. at 61 (Oct. 29, 2018).

In addition, Electropura asserted that the Monoblock did not work properly; that "key components of the Monoblock quickly oxidized and therefore became unsanitary for bottled water use"; and that "many of the Monoblock's key components contained latent but inherent defects in materials and workmanship" making the machine "essentially unfit and unsuitable for its intended purposes." ECF No. 1 ¶ 28. Trial Tr. at 61-65 (Oct. 29, 2018).

## LEGAL STANDARD

### A. Judgment as a Matter of Law Under Rule 50

Under Federal Rule of Civil Procedure Rule 50, a court may enter judgment as a matter of law once "a party has been fully heard on an issue" and "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In other words, the jury verdict should be overturned and judgment as a matter of law entered "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it also possible to draw a contrary conclusion." *Id.* Moreover, a motion for judgment as a matter of law should be granted "only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result." *McEuin v. Crown*

*Equip. Corp.*, 328 F.3d 1028, 1036 (9th Cir. 2003), *as amended on denial of reh'g and reh'g en banc* (June 17, 2003).

In evaluating a motion for judgment as a matter of law, a court does not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *see also EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* Instead, the court "must draw all reasonable inferences in favor of the nonmoving party." *Id.* That is, "the court should give credence to the evidence favoring the nonmovant as well as 'that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151, 120 S. Ct. 2097 (internal citation omitted).

**B. New Trial Under Rule 59**

Under Federal Rule of Civil Procedure 59(a), a new trial may be granted on all or some of the issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Because "Rule 59 does not specify the grounds on which a motion for a new trial may be granted," the court is bound by historically recognized grounds. *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003). These grounds include verdicts contrary to the weight of the evidence, a verdict based on false or perjurious evidence, damages that are excessive, and trials that were not fair to the moving party. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007); *see also Passatino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000) ("The trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."). Erroneous evidentiary rulings and errors in jury instructions can also serve as grounds for a new trial. *See Ruvalcaba v. City of Los Angeles*, 64 F.3d 323, 1328 (9th Cir. 1995). The burden of showing harmful error "rests on the party seeking the new trial." *Malhiot v. S. Cal. Retail Clerks Union*, 735

F.2d 1133 (9th Cir. 1984).

Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014). "Instead, the district court can weigh the evidence and assess the credibility of the witnesses." *Id.*

The decision to grant a new trial motion lies within the court's discretion. *See Merrick v. Paul Revere Life Ins. Co.*, 500 F.3d 1007, 1013 (9th Cir.2007). But although the Court may weigh the evidence and assess the credibility of witnesses when ruling on a Rule 59(a) motion, it may not grant a new trial "merely because it might have come to a different result from that reached by the jury." *Roy v. Volkswagon of Am., Inc.*, 896 F.2d 1174, 1176 (9th Cir. 1990) (quotation marks and citation omitted); *see also Union Oil Co. of Cal. V. Terrible Herbst, Inc.*, 331 F.3d 735, 743 (9th Cir. 2003) ("It is not the courts' place to substitute our evaluations for those of the jurors."). A court will not approve a miscarriage of justice, but "a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter." *Landes Constr. Co., Inc. v. Royal Bank of Can.*, 833 F.2d 1365, 1371 (9th Cir. 1987) (citations omitted). As such, a new trial should be granted only when after "giv[ing] full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed" by the jury. *Id.* at 1365.

## DISCUSSION

### A. Accutek's Motion for Judgment as a Matter of Law

After the close of Electropura's case-in-chief, Accutek moved for judgment as a matter of law pursuant to Rule 50(a) on two grounds: (1) that Electropura's fraud claims fail as a matter of law; and (2) that the lack of fraud required the dismissal of Electropura's unjust enrichment cause of action. ECF No. 111. Pursuant to Rule 50(b),

Court took the motion under submission and chose not to make a pre-verdict ruling on the motion. *See* Fed. R. Civ. P. 50(b).[2]

Accutek has not filed a renewed post-verdict request for judgment as a matter of law under Rule 50(b). When Accutek expressed its intention to make motions for judgment as a matter of law pursuant to Rule 50(a)(1) on November 5, 2019, the Court deferred ruling on the motions and invited Accutek to prepare briefing on the issue. Since the Court took the matter under written advisement and deferred consideration of the motion until after the jury returned a verdict, the Court will now evaluate the motion as a post-verdict motion for judgment as a matter of law under Rule 50(b). *See, e.g., Op Art, Inc. v. B.I.G. Wholesalers, Inc.*, No. 3:03-CV_0887-P, 2006 WL 3347911, at *1 (N.D. Tex. Nov. 17, 2006) (finding that "a court's deferred consideration effectively converts the Rule 50(a) motion int a post-verdict Rule 50(b) motion"); *see also Ketchum v. Nall*, 425 F.2d 242, 243 (10th Cir. 1949) (citing Fed. R. Civ. P. 50(b) for the proposition that a "motion for directed verdict . . . may be taken under advisement and ruled upon after the jury has returned a verdict.").

Pursuant to Rule 50(b), the Court reviews these issues for a legally sufficient evidentiary basis for the jury's verdict when viewing the evidence in the light most favorable to Plaintiffs and drawing all evidentiary inferences in Plaintiffs' favor. Fed. R. Civ. P. 50(a). Courts review a jury's verdict for substantial evidence in ruling on a properly made motion under Rule 50(b). *Janes v. Wal-Mart Stores, Inc.*, 279 F.3d 883, 888 (9th Cir. 2002). Substantial evidence is "such relevant evidence as reasonable minds might accept as adequate to support a conclusion.'" *Mockler v. Multnomah Cnty.*, 140 F.3d 808, 815 n.8 (9th Cir. 1998) (citing *Murray*, 55 F.3d at 1452). Judgment as a matter

---

[2] Fed. R. Civ. P. 50(b) states that "if the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment – or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged – the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59."

of law "is appropriate when the jury could have relied only on speculation to reach its verdict." *Lakeside-Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009).

### 1. Plaintiff's Fraud Claims

In its Rule 50(a) motion, Accutek moved for judgment as a matter of law on the basis that there was insufficient evidence to support: 1) Electropura's first fraud claim for intentional misrepresentation of material fact; (2) Electopura's second fraud claim for concealment of material facts; (3) Electropura's third claim for negligent misrepresentation, and (4) Electropura's seventh claim for unjust enrichment. However, the jury returned verdicts in favor of Accutek on Electropura's second claim for concealment, third claim for negligent misrepresentation, and seventh claim for unjust enrichment. Accordingly, Accutek's Motion is moot as to these three claims. All that remains for the Court's consideration is the first claim for intentional misrepresentation.

### A. Intentional Misrepresentation

Electropura's first cause of action asserts that Accutek engaged in fraud by intentional misrepresentation of material facts through four representations: (1) that the Monoblock is capable of speeds of filling up to 11,000 BPH (bottles per hour); (2) that the Monoblock was made in the United States; (3) that the Monoblock contains 316 stainless steel; and (4) that the Monoblock uses food grade materials. In response, Accutek argues Electropura filed to provide sufficient evidence to prove each of these claims.

Under California law, the elements of fraud by intentional misrepresentation are clear: "(1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or *scienter*); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004). In light of the evidence most favorable to Plaintiff, the Court finds that the jury had a reasonable and legally sufficient basis to conclude that Accutek made intentional misrepresentation of material facts to induce Electropura's purchase of the Monoblock.

### 1) First Representation: Monoblock's Performance for Bottles per Hour

#### a) Misrepresentation

The first representation at issue is Accutek's statement that "this particular model of the Monoblock is capable of Speeds of up to 11,000 BPH (bottles per hour).'" Compl. ¶ 24. Electropura contends that it relied determinately on this representation – described in Defendants' quote No. 52113 for the Monoblock – in purchasing the item. ECF No. 1-2.

Accutek moves for judgment as a matter of law on this bottling speed representation on the basis that Electropura failed to show that the written statements were false. First, Accutek argues that Plaintiff's case revealed no evidence that proved "the Monoblock machine, as designed, manufactured, or built, was incapable of performing at speeds up to 11,000 bottles per hour." ECF No. 111 at 4. Specifically, Accutek contends that Plaintiff proffered no evidence of either "the speed of Accutek bottling systems installed at different facilities prior to November 2013" or of "any survey or testing of the Monoblock machine in other conditions or with different configurations." ECF No. 111 at 4. And even if Plaintiff's testimony about actual bottling speeds were taken as true, Accutek contends that "2,500 bottles per hour was still 'up to' 11,000 per hour." ECF 129 at 3. As such, Accutek surmises that it did not make a misrepresentation since the company never expressly guaranteed that the Monoblock would reach 11,000.

Courts have generally found a "misrepresentation" where it is "probable that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled." *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 977-78 (C.D. Cal. 2013). The question of whether a statement is a misrepresentation in most cases presents a question of fact for the fact finder at trial. *Williams v. Gerber Prods Co.*, 552 F.3d 934, 938 (9th Cir. 2008).

Here, the evidence presented at trial – in the light most favorable to Electropura – supports the conclusion that a reasonable consumer would be misled about the accuracy

of Accutek's representations regarding Monoblock's bottling capabilities. The jury was presented with evidence that Electropura required bottling machines capable of filling 680 milliliter -sized bottles at a rate of not less than 7,200 bottles per hour. Accutek has acknowledged that it represented the Monoblock as capable of production speeds up to 11,000 bottles per hour. Electropura's witnesses Orlando Perla, William Hernandez, and Julian Caballero testified that the Monoblock never exceeded bottling speeds of more than 2,400 bottles per hour. Even Jaime Garcia, Accutek's employee and witness, testified that he was only able to achieve a maximum production speed of 3,600 bottles per hour after three visits to Electropura's plant. And finally, Orlando Perla and Rene Perla recounted that Jaime Garcia later informed them that the maximum bottling speed he could achieve with Accutek's equipment was 4,000 bottles per hour. The evidence shows that the Monoblock was incapable of reaching 7,200 bottles per hour required let alone the up to 11,000 bottles per hour represented by Accutek.

Although Electropura did not present evidence of the Monoblock's functionality outside the context of the El Salvador facility, it produced evidence as to its experience with the machine and the admission of Accutek's employee Jaime Garcia as to the Monoblock's maximum capabilities. The evidence at trial proved that the Monoblock never exceeded 3,600 bottles per hour. The direct and circumstantial evidence and reasonable inferences derived from it supports the conclusion that the Monoblock was incapable of bottling anywhere near the 11,000 bottles per hour that was advertised or the 7,200 bottles per hour that Electropura required. While Accutek claims that the evidence at trial shows that the Monoblock was capable of filling 11,000 bottles per hour (ECF No. 111-1 at 5), Accutek has failed to cite the record where this evidence appears. The Court concludes that a reasonable consumer would be misled by Defendant's statements about the capabilities of the bottling line.

Next, Accutek's argument that "2,500 bottles per hour was still 'up to' 11,000 per hour." – is disingenuous and strains credulity. Under this logic, if the Monoblock filled 50 bottles per hour, there was no misrepresentation because 50 is somewhere between

zero and 11,000.  Under Accutek's view, a car manufacturer is free to represent that its high-end sports car can reach speeds up to 220 miles per hour even though it can only reach 50 miles per hour under the theory that 50 miles per hour is "up to" 220 miles per hour.  While Accutek did not guarantee that the Monoblock would perform at 11,000 BPH, sellers are not free to use "up to" as a means of misrepresenting a product's performance.[3]  Here, Electropura provided, at Accutek's request, an auto-CAD to determine if the Monoblock was capable of reaching the 7,200 bottles per hour that it sought.  After its engineers reviewed the drawings, Accutek assured Electropura the machine would fit at the plant and failed to inform Mr. Perla that the space would prevent the machine from reaching its claimed capabilities.  In the light most favorable to Electropura, a reasonable consumer would have been misled by Accutek's representations as to the Monoblock's capabilities.

Accutek's "upfront representation" of the Monoblock's capabilities is similar to the defendant company's misrepresentation in *Hobbs v. Brother International Corporation*, 2016 WL 7647674 (C.D. Cal) (August 31, 2016) at *8.  In *Hobbs*, the Court found that a reasonable customer could be misled by Defendant company's affirmative misrepresentations about a printer's scanning capacity when Defendant stated that the printer could "scan up to the document glass size" and "up to letter-size documents."  *Id.* Despite Defendant's later disclosures in website and print materials that the machine did not support borderless and letter-size scanning, the Court found that Defendant's representations could mislead a substantial portion of reasonable consumers.  *Id.*  In this

---

[3] While Accutek does not claim that the statement of "up to" 11,000 bottles per hour constitutes non-actionable puffery, cases considering puffery defenses similarly focus on the reasonableness of consumer reliance on the false statement. *Cf. Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.,* 911 F.2d 242, 246 (9th Cir. 1990) (the common theme that runs through cases considering puffery in a variety of contexts is that consumer reliance will be induced by specific rather than general assertions).  Here, the statements were sufficiently specific as to mislead a reasonable consumer.

case, the jury was presented with a legally sufficient evidentiary basis to find that Accutek affirmatively and materially misrepresented the Monoblock's capabilities.

### b) Intentionality

Having determined that Accutek's statement about bottling speeds could reasonably constitute a misrepresentation, the Court must next turn to Accutek's argument that Electropura cannot prove intent to induce reliance – a necessary element of intentional misrepresentation.

Accutek asserts that its verbal representation about performance is non-actionable because Accutek had no intent to defraud. Even if the Monoblock machine did not work as represented, Accutek argues "something more than mere nonperformance is required to prove the defendant's intent not to perform his promise." *Tenzer v. Superscope, Inc.*, 39 Cal.3d 18, 30; *Precise Aero. Mfg. v. MAG Aero Indus., LLC*, 2018 U.S. Dist. LEXIS 119100, at *19-20 (C.D. Cal. Feb. 16, 2018). Here, Accutek submits that Electropura has not articulated any basis for fraudulent intent under *Tenzer*. Accutek avers that the delivery and installation of the Monoblock on Electropura's premises – coupled with Accutek's post-installation responsiveness and return trip to Electropura's facilities to correct subsequent problems – offset any evidence of intent to mislead.

Fraud is "rarely susceptible of direct proof." *Connolly v. Gishwiller*, 162 F.2d 428, 433 (7th Cir. 1947). It is settled law that circumstantial evidence is competent to show intent to defraud. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). Factfinders must often ""hear the evidence and determine whether to draw an inference that [the] defendant intended to defraud based on all of the circumstances. *Urica, Inc. v. Pharmaplast S.A.E.*, 2013 WL 12123230 (C.D. Cal.) (May 6, 2013). As such, intent may be inferred from misrepresentations made by the defendants, and the scheme itself may be probative circumstantial evidence of an intent to defraud. *United States v. Sullivan*, 522 F.3d 967, 974 (9th Cir. 2008). The inferences gathered from a chain of circumstances "depend largely upon the common sense knowledge of the motives and intentions of men in like circumstances." *Connolly v. Gishwiller*, 162 F.2d 428, 433 (7th

15

Cir. 1947). Accordingly, the "only intent by a defendant necessary to prove a case of fraud is the intent to *induce reliance*." *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 93 (Sept. 5, 2001) (emphasis in original). Moreover, liability is affixed "not only where the plaintiff's reliance is *intended* by the defendant but also where it is *reasonably expected* to occur." *Id.*

The Court concludes that Electropura has adduced sufficient circumstantial evidence from which a rational juror could find that Accutek intended to induce Electropura to enter into the agreement by misrepresenting the Monoblock's capabilities. This evidence includes a series of falsehoods in the marketing of the Monoblock claiming it was produced in the United States and made with stainless steel that was food grade. To the extent that the jury concluded that these claims were false, it was entitled to conclude that it was part of a pattern of intentional deception.

In addition, at trial, Plaintiff pointed to numerous instances that suggest that Defendant intended or 'reasonably expected' to benefit from the misstatements. *Lovejoy*, 92 Cal. App. 4th at 93. First, there was evidence that Accutek knew exactly the type of machine that Electropura sought to purchase, including the desired parameters and capabilities. Trial Tr. at 14-15 (Oct. 29, 2018). During questioning, Electropura's witness Orlando Perla testified that he had rejected quotes for machines from Accutek sales representative Joe Quezada with higher and lower bottling capacities of 7,200 BPH and 14,000 BPH before settling on the 24-head, 24-filler, 8-capper 11,000 BPH version of the Monoblock. *Id.* at 27-31. Perla expounded that the machine capable of 14,000 BPH was rejected partially because it was both too large to fit in available space and capable of speeds beyond what Electropura needed. *Id.* at 30. Next, Orlando Perla noted that Accutek represented that each Monoblock machine would be specifically designed to suit product demands, space constraints, and the production environment in order to optimize output. *Id.* at 21-22.

Orlando Perla also disclosed that prior to purchasing the Monoblock in August 2013, he had provided Accutek with an "autocad" – or a layout of the space that

Electropura had available for the machine for the express purpose of making sure that the dimensions were suitable for the Monoblock. *Id.* at 35-37, 39-40. Although Accutek sales representative Joe Quezada initially expressed concerns about the space constraints, Orlando Perla testified that Quezada later responded that the engineers had determined the space would be sufficient. *Id.* Electropura agreed to proceed with the purchase of the Monoblock only after this assurance from Quezada and the Accutek engineer. *Id.* In addition, Orlando Perla attested that Electropura sent samples of their bottles, caps, and labels in varying sizes to Accutek for testing purposes. *Id.* at 40-41. At no time, according to Orlando Perla, did Accutek ever indicate that space constraints or the labeler would hamper the Monoblock's ability to reach the optimal speeds of 11,000 BPH. *Id.* at 42-43.

As a result, the Court finds that Accutek had ample knowledge of Electropura's needs with respect to a bottling line. The Court also concludes from the evidence presented at trial that Electropura repeatedly attempted to verify with Accutek the Monoblock's suitability in the context of its own facilities and products. These circumstances – coupled with Accutek's enduring assurances prior to Electropura's purchase of the Monoblock – would reasonably lead a juror to deduce that Accutek both knowingly intended to induce reliance and also reasonably expected such reliance to occur. Accordingly, the Court finds that Electropura has offered a legally sufficient basis to prove intent to induce reliance.

**2) Remaining Representations: Statements that the Monoblock was Made in the USA, Made with Food Grade Stainless Steel, and Made with 316 Stainless Steel**

Electropura argues that Accutek made three other material and intentional misrepresentations in this case: (1) Accutek's assertion that the Monoblock was "Made in USA;" (2) Accutek's claim that the Monoblock was made with food-grade stainless steel; and (3) the representation that Monoblock's food-grade composition would include "316 stainless steel." ECF No. 126 at 12.

3:16-cv-00724-GPC-MSB

Accutek contends that these remaining representations fail because they lack a basis for either "out of pocket" damages or consequential damages. According to Accutek, "out-of-pocket" damages must be predicated on – and limited to – "the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1240 (1995) (citing *Stout v. Turney*, 22 Cal.3d 718, 725 (1978)). Moreover, Accutek proffers that plaintiffs cannot recover consequential damages based upon "speculation or even a mere possibility that the wrongful conduct of the defendant caused the harm." *Williams v. Wraxall*, 33 Cal.App.4th 120, 132 (1995). For support, Accutek points to *Sargon Enterprises, Inc. v. University of Southern Cal.*, 55 Cal.4th 739, 768 (2010). There, the California Supreme Court properly excluded testimony of lost profits on the basis that an expert based his opinions on a hypothetical market share beyond the plaintiff's market share. *Id.*

In this case, Accutek submits that Electropura did not introduce evidence during trial of the fair market value of the Monoblock machine at the time of purchase. ECF No. 111 at 7. As such, Accutek surmises that "Plaintiff has not shown the value of the Monoblock machine is worth less than what was paid for it." *Id.* at 8. In addition, Accutek notes that Clara Rodriguez de Grenados, Electropura's only witness who testified in support of its claim for consequential damages, expressly admitted that she had no opinion on the damages that stemmed from the representations about the Monoblock's stainless steel and American-made composition. *Id.* Consequently, Accutek avers that Electropura also did not meet its burden to establish proof of – and recovery for – consequential damages from the asserted representations.

To recover "out of pocket" damages under California law, a defrauded party is ordinarily limited to recovering his "out-of-pocket" loss." *Alliance Mortgage Co. v. Rothwell*, 10 Cal.4th 1226, 1240 (1995) citing *Kenly v. Ukegawa*, 16 Cal.App 4th 49, 53 (1993). "Out of pocket" damages are typically directed to "restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the

3:16-cv-00724-GPC-MSB

difference in actual value at the time of the transaction between what the plaintiff gave and what he received." *Id.* (citing *Stout v. Turney*, 22 Cal.3d 718, 725 (1978)).  And to prove consequential damages, plaintiffs must establish a "complete causal relationship between the fraud or deceit and the plaintiff's damages." *Small v. Fritz Companies, Inc.*, 30 Cal.4th 167, 202 (2003) (*citing Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal.3d 197, 219 (1983).  Causation requires "proof that the defendant's conduct was a 'substantial factor' in bringing about the harm to the plaintiff" and evidence of causation must "rise to the level of a reasonable probability based upon competent testimony." *Id.* at 133.

The Court finds that Electropura has provided an adequate basis for "out-of-pocket" or consequential damage award of $282,825.  At trial, Electropura introduced testimony that Accutek represented all of its machines – including the Biner Ellison Monoblock – as American-made through their website, brochures, quotes, and invoices.  Moreover, Electropura presented evidence that the filling components of the machines were marketed as 316 stainless steel in Accutek's specification sheets.  Orlando Perla recounted that Accutek knew that Electropura specifically eschewed Chinese-made machines and sought to purchase only American-made stainless-steel machines with food-grade components for corrosion-reducing, quality, and reputational reasons.  And finally, Electropura elicited testimony from Mr. Mark Bell and Dr. Dana Medlin that provided a reasonable basis for a jury to assume that the machine was Chinese-made and constructed largely with non-food-grade components and magnetic – not stainless – steel.  But for Accutek's representations about the machine's material composition and its origin, Electropura would not have purchased the Monoblock.

Electropura also provided specific evidence to justify "out of pocket" damages and a causal relationship for consequential damages.  First, Electropura introduced evidence that it paid $370,408.46 in total for the bottle filling system, ECF No. 1-2 at 26, with $140,000 for the Biner Ellison Monoblock machine.  Trial Tr. at 10-11.  According to his online research, Orlando Perla testified that a comparable Chinese-made Monoblock

would have cost around $40,000 at the time of purchase so that the Biner Ellison Monoblock was overpriced $100,000.  Also, Clara Rodriguez de Granados, general accountant for Electropura, calculated the additional costs incurred in production from diminished bottling speeds through of the company's use of the Monoblock as follows: $10,896.89 in 2013, $58,477.13 in 2014, $64,269.83 in 2015, $53,613.74 in 2016, and $7,595.25 from January through June of 2017 – for a total of $194,852.84 and grand total of $294,852.84.  ECF No. 127 at 23, 24, and 26.  And when asked about the financial distinction between a stainless steel and a magnetic steel machine, Rene Perla noted that magnetic steel equipment was commercially worthless for bottling companies and that the Monoblock's magnetic steel composition had caused the machine to rust.  As a result, Rene Perla testified that he was unable to find buyers despite his repeated attempts to sell the machine for scrap metal.

Viewing the facts in the light most favorable to Electropura as the nonmoving party, the Court finds that Plaintiff offered sufficient evidence from which a reasonable jury could both infer that "out of pocket" and consequential damages were warranted and award damages in the amount of $282,825.  Accordingly, the Court **DENIES** Accutek's Motion for Judgment as a Matter of Law with respect to the sufficiency of evidence to support the intentional misrepresentation claim and any respective "out of pocket" and consequential damages.

**3) Waiver of Rescission Remedy**

Finally, Accutek seeks to dismiss, as an alternative remedy, Electropura's right to rescind its agreement with Accutek.  Notwithstanding the Court's finding on Electropura's fraud claims, Accutek urges that the Court must also disallow Electropura from rescinding the purchase agreement because Electropura neither gave written notice of rescission prior to the filing of the lawsuit nor made efforts to return the bottling system.  ECF No. 111 at 8.  As a result, it follows that Electropura failed to comply with Cal. Civ. Code Section 1691, which governs the mechanics of contract rescission and requires "a plaintiff to give notice of rescission to the other party and to return, or offer to

return, all proceeds he received from the transaction." *Id.*

Since the Court has found that Electropura provided sufficient evidence at trial to reasonably establish a claim for intentional misrepresentation and any subsequent consequential and out of pocket damages, Accutek's motion challenging the alternative remedy of rescission is moot.

## B. Accutek's Motion for New Trial

The Court has already addressed Accutek's arguments with respect to the intentional misrepresentation claim and "out of pocket" or consequential damages in evaluating the motion for judgment as a matter of law. For the same reasons delineated in that analysis, the Court denies the motion for new trial. However, the Court will address Accutek's remaining claim in support of a new trial – that the jury's finding of punitive damages was legally invalid and should be vacated.

### 1. Punitive Damages

Accutek moves for a new trial on the basis that the jury's punitive damages award is unsupported by the evidence. For Electropura to recover an award of punitive damages, Accutek argues that Electropura must have introduced evidence of Accutek's net worth at trial. Because Electropura did not provide any "profit and loss statements, [ ] quarterly reports, [or] [ ] income tax records" and elicited no expert testimony that established Accutek's financial condition, Accutek contends that the jury's award of $525,000 in punitive damages cannot stand as a matter of law. ECF No. 130 at 14, 15. In response, Electropura counters that the reprehensibility of Accutek's behavior – paired with the reasonableness of the amount awarded in punitive damages in comparison to actual damages – justified the jury's assessment of punitive damages. To further support its opposition, Electropura submits the declarations of two jurors from trial that "describe, in substantial detail, the deliberate process by which the jury arrived at its unanimous decision to punish Accutek for its fraudulent conduct by awarding in favor of Electropura, and against Accutek, punitive damages in the amount of $525,000." ECF No. 134 at 8.

///

### a. Juror Declarations

As a preliminary matter, the Court **STRIKES** the Declarations of Todd Peters and Omotunde Ogungbe, ECF No. 134-1 and 134-2, the two juror declarations attached to Electropura's opposition. Electropura has submitted these declarations and incorporated them into its opposition to purportedly "provide substantial and meaningful insight into the jury's deliberative process." ECF No. 134 at 11. This is precisely prohibited by Federal Rule of Evidence 606, which forbids a juror from testifying about "any juror's mental processes concerning the verdict or indictment" or "the effect of anything on that juror's or another juror's vote" during an inquiry into the validity of a verdict. Fed. R. Evid. 606. Barring three narrowly defined exceptions, which are absent here, the court "**may not receive a juror's affidavit or evidence of a juror's statement on these matters**." *Id.* [Emphasis added.] The three exceptions are whether: (a) extraneous prejudicial information was improperly brought to the jury's attention; (b) an outside influence was improperly brought to bear on any juror; or (c) a mistake was made in entering the verdict on the verdict form. *Id.* Electropura's affidavits satisfy none of these exceptions. Instead, the affidavits' sole objective is to present this Court with expressly proscribed details about the jury's mental and deliberative process in order to oppose Accutek's post-trial motions. As officers of the court, counsel is expected to research and comply with the Federal Rules of Evidence. Electropura has failed to do so and has submitted evidence which is clearly, plainly and unequivocally prohibited by Rule 606. Counsel for Electropura is placed on notice that any further unjustified failures to abide by the Federal Rules of Evidence may result in sanctions.

### b. Evidentiary Basis for Punitive Damages

A federal court sitting in diversity must follow the substantive law of the forum state and is bound by the forum state's highest court. *Neveau v. City of Fresno*, 392 F.Supp.2d 1159, 1183 (E.D. Cal. 2005); *United States Fidelity & Guaranty Co. v. Lee Investments, LLC*, 641 F.3d 1126, 1133 (9th Cir. 2011). On the question of punitive

damages, the California Supreme Court has held that plaintiffs must demonstrate three factors to uphold an award of punitive damages: (1) reprehensibility of the conduct; (2) the amount of punitive damages must be proportional to the compensatory damages; and (3) the financial condition of the defendant. *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 928 (1978). To prove punitive damages, all three factors must be satisfied by evidence at trial. Even if "an award is entirely reasonable in light of the other two factors in *Neal, supra*, 21 Cal.3d 910 the award can be so disproportionate to the defendant's ability to pay that the award is excessive *for that reason alone*." *Adams v. Murakami*, 54 Cal.3d 105, 111 (1991) [italics in original]. Without "such evidence [of defendant's financial condition], reviewing courts will be unduly restricted in their attempts to assess whether awards of punitive damages are excessive." *Id*. Specifically, a punitive damage award "whatever its amount, cannot be sustained absent evidence of the defendant's financial condition" as "such evidence is 'essential to the claim for relief.'" *Adams v. Murakami*, 54 Cal.3d 105, 119 (1991). The Ninth Circuit has also confirmed the California Supreme Court's requirements for punitive damages, noting that "the *Murakami* court held that such evidence must be presented to the jury, and that the burden of presentation lies with the plaintiff." *Morgan v. Woessner*, 997 F.2d 1244, 1259 (9th Cir. 1993).

To establish a defendant's financial condition and support an award of punitive damages, a plaintiff must generally supply "evidence of the defendant's net worth, not gross assets." *Viasphere International, Inc. v. Vardanyan*, 2017 U.S. Dist. LEXIS 40832, at *13 (N.D. Cal. Mar. 21, 2017); *Boyle v. Lorimar Prods.*, 13 F.3d 1357, 1360-61 (9th Cir. 1994). In most cases, "evidence of earnings or profit alone are not sufficient 'without examining the liabilities side of the balance sheet.'" *Baxter v. Peterson*, 150 Cal.App.4th 673, 680 (2007). Evidence of the profits gained by defendant is alone inadequate as "it gives only the assets without the liabilities." *Robert L. Cloud & Assocs. V. Mikesell*, 69 Cal.App.4th 1141, 1152 (1999); *see also Soto v. BorgWarner Morse TEC Inc.*, 239 CalApp.4th 1141, 1152 (1999).

Electropura failed to provide sufficient evidence to justify the jury's award of punitive damages. During the punitive damages phase of trial, Plaintiff asked six questions of one witness, Electropura's employee Orlando Perla. In response, Mr. Perla acknowledged that he had no personal knowledge of Accutek's financial condition and admitted that he had been told "nothing" about the "financial strength of the company." ECF No. 128 at 14. Nor did Electropura provide any additional documentation about Accutek's financial conditions. And finally, Electropura has cited no authorities contradicting settled law that evidence of a defendant's financial condition is a necessary prerequisite to upholding an award for punitive damages. The simple fact that Accutek has sold expensive bottling machines and might receive profits through such sales is plainly insufficient to satisfy this requirement. In *Results by IQ LLC v. NetCapital.com LLC*, the Court vacated an award of punitive damages on the basis that plaintiff presented no evidence of the defendant's financial condition. 2013 U.S. Dist. LEXIS 130119, at *14-15 (N.D. Cal. Sep. 11, 2013). The absence of such evidence rendered it "impossible for the Court to uphold the jury's verdict on this point" and as such, "[t]here is simply no way for the jury to have found punitive damages warranted in this case." *Id.*

Similarly, it is impossible to uphold the punitive damages verdict rendered in this case. Accordingly, the Court must **GRANT in part** Accutek's motion for a new trial on punitive damages.[4]

## CONCLUSION

Accordingly, the Court **DENIES** Accutek's Motion for Judgment as a Matter of

---

[4] California state law would permit entry of judgment as a matter of law in favor of Accutek on a finding of insufficient evidence to support punitive damages. *Baxter v. Peterson* (2007) 150 Cal.App.4th 673, 692 (Since plaintiff had a full opportunity to present his case, and failed to introduce evidence of defendant's financial condition, the evidence was insufficient, punitive damage award reversed, and no retrial of the issue was required). While California substantive applies as to determining punitive damages, Rules 50 and 59 govern the procedures required in post-trial proceedings. Since Accutek only moved for a new trial on this issue, the Court cannot rule in favor of Accutek as a matter of law on punitive damages. While the Court will grant the motion for new trial on punitive damages, there will be no additional discovery authorized, the Court will set the matter for a settlement conference following the entry of this order, and a retrial will be limited to two trial days.

law and **GRANTS IN PART** Accutek's Motion for New Trial on Accutek's punitive damages claim. The Court **DENIES** Accutek's motion for New Trial on all other claims.

The Court further instructs the parties to schedule and attend a settlement conference with Magistrate Judge Berg following the entry of this order to discuss the possibility of a settlement on the remaining claim for punitive damages.

**IT IS SO ORDERED.**

Dated: July 24, 2019

Hon. Gonzalo P. Curiel
United States District Judge

3:16-cv-00724-GPC-MSB